UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| United States of America, | Case No. 2:21-cr-00323-CDS-DJA |
|---|---|
| Plaintiff | |
| v. | **Order Denying Defendant's Motion to Dismiss and Granting Motion to File Amicus Brief** |
| Juan Pablo Paredes-Medina, | |
| Defendant | [ECF Nos. 29, 30] |

Defendant Juan Pablo Paredes-Medina is accused of violating 8 U.S.C. § 1326(a)–(b), the statute criminalizing previously deported aliens[1] who illegally re-enter the United States. Indictment, ECF No. 1. On June 13, 2022, Paredes-Medina filed a motion to dismiss the indictment against him, arguing that § 1326 violates the Fifth Amendment's equal-protection guarantee. *See generally* Motion to Dismiss, ECF No. 30. The government opposes the motion, contending that the statute was passed within Congress' plenary power and that Paredes-Medina relies on an outlier case to support his position. ECF No. 33. And in support of Paredes-Medina's motion, the American Civil Liberties Union of Nevada (ACLU) seeks leave to file a brief as *amici curiae* on behalf of itself, the University of Nevada Las Vegas (UNLV) Immigration Clinic, and the Nevada Attorneys for Criminal Justice. Motion for Leave to File Brief as *Amici Curiae*, ECF No. 29 at 2. Because the proposed *amicus* brief provides useful background information about the at-issue statute, I grant the ACLU's motion for leave to file it, and I consider it in my decision. Despite that additional information, I deny Paredes-Medina's motion to dismiss because he has not demonstrated that the statute under which he was indicted was motivated by racially discriminatory intent or purpose.

---

[1] "When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) (citations omitted).

I.    *Amici curiae* brief

The ACLU filed its motion for leave to file a brief as *amici curiae* on June 10, 2022. ECF No. 29. The ACLU attaches its proposed *amicus* brief to the motion as an exhibit.[2] ECF No. 29-1. The brief states that it was filed on behalf of various community groups: the UNLV Immigration Clinic at William S. Boyd School of Law, Nevada Attorneys for Criminal Justice, and the ACLU of Nevada. ECF No. 29-1 at 6–7. Neither the United States nor Paredes-Medina opposes the motion. The ACLU characterizes its brief as "useful because it does not merely duplicate the arguments raised by either party." ECF No. 29 at 3. I agree and find that the brief provides useful information regarding the legislative history of the statute at issue.

The court has broad discretion to grant or refuse a prospective *amicus* participation. *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). "Amicus may be either impartial individuals or interested parties." *Washington v. DeVos*, 2020 WL 12834538, at *1 (E.D. Wash. July 24, 2020) (citing *Funbus Sys., Inc. v. Cal. Pub. Utils. Comm'n*, 801 F.2d 1120, 1125 (9th Cir. 1986)). In deciding whether to grant leave to file an *amicus* brief, courts consider whether the briefing "supplement[s] the efforts of counsel, and draw[s] the court's attention to law that escaped consideration." *Miller-Wohl Co., Inc. v. Comm'r of Labor & Indus. Mont.*, 694 F.2d 203, 204 (9th Cir. 1982). An *amicus* brief should be permitted on behalf of a party lacking competent representation, when the *amicus* has an interest in some other case that may be affected by a decision in the present case, or when the *amicus* has unique information that could help this court beyond the assistance already provided by the parties' lawyers. *United States v. Renown Health*, 2016 WL 6803078, at *2 (D. Nev. Nov. 15, 2016) (citing *Miller-Wohl*, 694 F.2d at 204).

I find that the brief adds information about the remarks expressed by former Nevada Senator Pat McCarran, the drafter of § 1326, and his efforts to include § 1326 in the 1952

---

[2] Because the proposed brief is attached as an exhibit, it is numbered differently from the page numbers attached via the court's electronic filing system. I reference only the ECF pagination appearing on the top line of each page.

Immigration Act. *Compare id.* at 9–12 *with* ECF No. 30. The brief also describes how prospective individuals seeking asylum in the United States could be charged under § 1326.[3] ECF No. 29-1 at 13–21. And some of the *amici* in this case are likely to have interests in other cases that may be affected by the decision rendered in the instant matter. For those reasons, I grant the ACLU's unopposed motion for leave to file an *amicus* brief (ECF No. 29).[4]

## II.     Procedural history

On December 21, 2021, Paredes-Medina was indicted on one count of "Deported Alien Unlawfully Found in the United States" in violation of § 1326. ECF No. 1. The indictment alleges that Paredes-Medina was found in Nevada on or about October 15, 2021. *Id.* at 1. The government further alleges that Paredes-Medina was deported from the United States on five occasions: on or about July 30, 2009; July 16, 2015; April 19, 2017; March 1, 2019; and March 6, 2019. *Id.* Finally, the government alleges that when Paredes-Medina was found in the United States in October 2021, he had reentered and remained in the United States without seeking the express consent of the Attorney General of the United States or the Secretary of Homeland Security. *Id.* at 1–2. Paredes-Medina now moves to dismiss the indictment.[5]

---

[3] I decline to address the statute's impact on individuals who may qualify for or otherwise seek asylum in the United States. I am bound by Article III of the U.S. Constitution, mandating that courts consider live cases and controversies. "The federal courts . . . do not render advisory opinions. For adjudication of constitutional issues, 'concrete legal issues, presented in actual cases, not abstractions' are requisite." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (quoting *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)). The controversy presently before me concerns only Paredes-Medina, who brings an equal protection challenge to § 1326, not a challenge based on his effort to seek asylum. *See generally* ECF No. 30.

[4] Under this district's local rules, "[t]he failure of an opposing party to file points and authorities in response to any motion [except motions for summary judgment or attorney's fees] constitutes a consent to the granting of the motion." LR 7-2(d).

[5] He sought leave to file additional pages in support of his motion, arguing that the gravamen of his motion concerns the constitutionality of § 1326 and requires detailed briefing. ECF No. 27. The United States did not oppose Paredes-Medina's motion for leave to file excess pages, and I granted it, allowing him eight additional pages. ECF No. 28. The United States likewise sought leave to file excess pages, and I granted it one additional page. ECF No. 31; ECF No. 32.

### III. Brief overview of the history behind 8 U.S.C. § 1326

In relevant part, the statute that Paredes-Medina is charged with violating provides that "any alien who (1) has been denied admission, excluded, deported, or removed . . . and thereafter (2) enters, attempts to enter, or is at any time found in, the United States," without permission from the Attorney General, "shall be fined under title 18, or imprisoned not more than [two] years, or both." 8 U.S.C. § 1326(a). The history preceding the enactment of this statute reveals this country's sordid past with race relations and immigration policies. The statute's predecessor was enacted when Congress passed the Undesirable Aliens Act in 1929. That act provided that "[a]ny alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials . . . shall be guilty of a misdemeanor." Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2. Less than 30 years later, the Immigration and Nationality Act of 1952 (INA), oft-referenced as the McCarran-Walter Act, codified the unlawful reentry provision under Title 8 of the United States Code, Section 1326. Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 275, 66 Stat. 229. Since 1952, § 1326 has been amended five times to increase its penalties and deterrence measures. *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1004 (D. Nev. 2021).

### IV. The parties' arguments

Paredes-Medina moves to dismiss the indictment against him, arguing that § 1326 violates the equal-protection guarantee of the Fifth Amendment. *See generally* ECF No. 30. He challenges the law under the standard articulated by the United States Supreme Court in *Village of Arlington Heights v. Metro Housing Development Corp.*, 429 U.S. 252 (1977), alleging that § 1326 disparately impacts Latinos and that racially discriminatory intent and purpose were motivating factors in the decision to enact § 1326. *See generally* ECF No. 30.

The United States responds that Paredes-Medina's motion fails because Congress has plenary power over immigration regulation, so § 1326 should therefore be analyzed under deferential rational-basis review, rather than the more demanding *Arlington Heights* test. *See generally* ECF No. 33. The government contends that the law "easily passes that review, as it acts as a deterrent against successive illegal reentry." *Id.* And in the alternative, the United States contends that even if the *Arlington Heights* standard applies, Paredes-Medina has failed to meet his burden to demonstrate discriminatory intent. *Id.* The government points out that the record contains minimal evidence suggesting that Congress held discriminatory animus in 1952 when it enacted § 1326. *Id.* Finally, the government contends that, even if § 1326 was passed with discriminatory animus, the law survives the second step of the *Arlington Heights* test as "Congress would have passed the illegal reentry statute in [the] absence [of discriminatory animus.]" *Id.*

## V. Legal standards

The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The Due Process Clause of the Fifth Amendment contains an equal[-]protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). A law can violate the Fifth Amendment's equal[-]protection guarantee in three ways: "(1) a law can discriminate on its face[,] (2) authorities can apply a facially neutral law in a discriminatory manner[,] or (3) a legislature may enact a facially neutral law with a discriminatory purpose in a way that disparately impacts a specific group." *Carrillo-Lopez*, 555 F. Supp. 3d at 1001 (internal citations omitted).

*Arlington Heights* prescribed a framework under which if a plaintiff can demonstrate racial or ethnic discriminatory purpose to motivate the law in question, the court should apply a strict-scrutiny standard of review. *Arlington Heights*, 429 U.S. 252. That framework is designed to

guide the "sensitive inquiry" into whether a challenged government action was motivated by an "invidious discriminatory purpose." *Id.* at 266. The framework includes non-exhaustive factors for the court's consideration, including: (1) the disparate "impact of the official action," (2) the "historical background of the decision," (3) the "sequence of events leading up to the challenged decision," (4) any procedural or substantive departures, and (5) the relevant "legislative or administrative history." *Id.* at 266–68. No single factor is dispositive. *Id.* at 268. *Arlington Heights* did not address whether strict scrutiny, heightened scrutiny, or rational basis are appropriately applied to equal-protection claims based on racial or ethnic discrimination. *California v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994, 1023 (N.D. Cal. 2020). Instead, it established that in order to show a violation of the Equal Protection Clause, a challenger must provide proof of a racially discriminatory intent or purpose. *Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020) (discussing *Arlington Heights*). A party who asserts that a "law was enacted with discriminatory intent" carries the burden of proof. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (discussing the burden of proof when challenging a state law as one enacted with discriminatory intent (citing *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 481 (1997))).

**VI.  Discussion**

      a.    *I need not decide which framework applies to this motion.*

It is well established that "[i]nquiries into congressional motives or purposes are a hazardous matter." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). The hazardous and sensitive nature of such inquiries likely contributes to the divide amongst courts about how to approach equal-protection challenges to § 1326 brought by Paredes-Medina and others. Courts are split about whether to apply the *Arlington Heights* approach or the rational basis test. *Compare United States v. Machic-Xiap*, 552 F. Supp. 3d. 1055, 1071–78 (D. Or. 2021) (applying *Arlington Heights* to an

equal-protection challenge to § 1326) *and United States v. Wence*, 2021 WL 2463567, at *2–4 (D.V.I. Jun. 16, 2021) (same), *with United States v. Gutierrez-Barba*, 2021 WL 2138801, at *5 (D. Ariz. May 25, 2021) (applying rational-basis review after construing defendant's challenge as relating to alienage) *and United States v. Novondo-Ceballos*, 554 F. Supp. 3d 1114, 1122 (D.N.M. 2021) (concluding rational-basis standard of review was appropriate because the matter involves immigration).

    Here, the parties disagree over the applicable framework to resolve this motion: Paredes-Medina argues for the higher standard set forth in *Arlington Heights* whereas the government urges that I should apply the rational-basis test. But I need not decide which framework applies in resolving this motion because I find that Paredes-Medina has not met his threshold burden of demonstrating that § 1326 was motivated by racially discriminatory intent or purpose, nor has he shown that any racial animus itself behind § 1326 yields a racially disproportionate impact. *See United States v. Ponce-Galvan*, 2022 WL 484990, at *1 n.2 (S.D. Cal. Feb. 16, 2022) (stating that the court need not resolve the parties' dispute as to whether the *Arlington Heights* test applies to 8 U.S.C. § 1326 because even if it applied the *Arlington Heights* test, the defendant failed to meet his burden (citing *United States v. Suquilanda*, 2021 WL 4895956, at *5 n.3 (S.D.N.Y. Oct. 20, 2021) ("Because the [c]ourt would reject [defendant]'s argument under the strict standard of *Arlington Heights*, the [c]ourt need not conclude which level of review applies."))).

    Neither party contests that § 1326 has a disproportionate impact on Latino defendants. *See* ECF No. 30 at 11 ("Over 99% of those convicted of illegal reentry in 2020 were Hispanic."); ECF No. 33 at 27 ("[I]t is hardly surprising that so many people prosecuted for illegal reentry are Latino."). The parties do, however, disagree on *why* the impact exists. The government contends that disparate impact "is explained by geography, not animus." ECF No. 33 at 27. Paredes-Medina disagrees, contending that the government's focus only on the United States' southern

border—rather than its border with Canada—in and of itself indicates racial animus behind the statute. ECF Nos. 38 at 5–6; 30 at 12. Geography certainly plays a role in the statute's disproportionate impact on Latinos. For example, "common sense suggests that it would be substantially more difficult for an alien removed to China to return to the United States than for an alien removed to Mexico to do so." *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1070 (9th Cir. 2003). Paredes-Medina does not provide information or evidence to support his position, other than his criticism that the government's argument focuses on the southern border only.[6] Without more, and because another reason—geography—explains the disparate impact of § 1326, I find that Paredes-Medina has not met his burden of demonstrating that this is the "rare" case in which a constitutional violation is obvious from the impact of the law.

. . .

. . .

---

[6] It is possible that the government focuses more on the southern border of the United States than the northern one because, for example, "Mexicans still make up the majority of the unauthorized population" in the United States, "account[ing] for 51 percent of the 11 million unauthorized immigrants in 2018," versus the "less than 1 percent" of that population that is Canadian; I, of course, acknowledge that people from countries other than Mexico enter the United States through its southern border and use Mexico merely as one example. Emma Israel & Jeanne Batalova, *Mexican Immigrants in the United States*, Migration Policy Institute (Nov. 5, 2020), https://www.migrationpolicy.org/article/mexican-immigrants-united-states-2019 (last accessed Sept. 26, 2022); Emma Israel & Jeanne Batalova, *Canadian Immigrants in the United States*, Migration Policy Institute (June 15, 2021), https://www.migrationpolicy.org/article/canadian-immigrants-united-states-2021 (last accessed Sept. 26, 2022); *see also Countries of Birth for U.S. Immigrants, 1960–Present*, Migration Policy Institute, https://www.migrationpolicy.org/programs/data-hub/charts/immigrants-countries-birth-over-time?width=1000&height=850&iframe=true (providing data on the number of immigrants from different countries, based on the Migration Policy Institute's "tabulation of data from U.S. Census Bureau" and other sources). Under Federal Rule of Evidence 201, a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). And a court "may take judicial notice on its own." *Id.* at 201(c). Because the data—from the Migration Policy Institute, a nonpartisan research institution—is based on data from the U.S. Census Bureau, I find that its accuracy cannot reasonably be questioned, so I *sua sponte* take judicial notice of it for the limited purpose of demonstrating that more Latinos—using Mexican immigrants as an example—enter the United States than those from Canada, potentially explaining § 1326's disproportionate impact. *See United States v. 14.02 Acres of Land More or Less in Fresno Cnty.*, 547 F.3d 943, 955 (9th Cir. 2008) (quoting *Interstate Nat. Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1954)) ("Judicial notice is appropriate for records and 'reports of administrative bodies.'").

    b.  *Paredes-Medina fails to meet his burden.*

  Paredes-Medina's arguments that the impetus behind the 1929 Act was racial animus (ECF No. 30 at 12–21) are also insufficient to meet his burden. He relies on Professor Kelly Lytle Hernandez's declaration and testimony in an outlier case, *United States v. Carrillo-Lopez*, to advance his arguments. ECF No. 30 at 12–21; ECF No. 30-4; ECF No. 30-6. The evidence presented by Professor Hernandez, along with the 1929 legislative history, does demonstrate that many members of Congress were motivated to criminalize reentry due to their support for eugenics and opposition to increased presence of the "Mexican race" in the United States. *See generally* Immigr. Comm. Rep. on the Eugenical Aspects of Deportation, ECF No. 30-5; *Wence*, 2021 WL 2463567, at *5 (finding that members of the 1929 Congress sought to criminalize unlawful reentry based in part on "their endorsement of eugenics and the perceived inferiority of the 'Mexican race'").

  While this unsavory history is relevant to understanding the historical backdrop behind the unlawful reentry provisions, "it is not dispositive for understanding the motivation for the unlawful reentry provision" that Paredes-Medina is charged with committing "because that provision was reenacted in 1952[.]" *United States v. Hernandez-Lopez*, 2022 WL 313774, at *3 (S.D. Tex. Feb. 2, 2022) (citing *Wence*, 2021 WL 2463567, at *5 ("*Arlington Heights* directs the [c]ourt to look at the motivation behind the official action being challenged."); *Arlington Heights*, 429 U.S. at 265–67 (describing intent analysis in terms of "the challenged decision")).

  The legislative history that Paredes-Medina relies upon demonstrates that some members of the 1929 Congress were motivated to criminalize unlawful reentry "at least in part out of a desire to maintain the supposed purity of the white race and prevent racial mixing, and

intended the laws to target races they deemed undesirable." *United States v. Gallegos-Aparicio*, 2020 WL 7318124, at *3 (S.D. Cal. Dec. 11, 2020). I also recognize that racism abounded in the Senatorial debates about the 1952 bill. *See, e.g.*, 82 Cong. Rec. 8116 (June 26, 1952) ("Unless the [g]overnment takes drastic measures to stop the wetback invasion, the gates will be opened for every kind of influence that could possibly be dreamed of to permit illegal entry into the United States."). Proposed amendments to the 1952 Act included the "Wetback Amendment." 82 Cong. Rec. 8122 (June 26, 1952). But, that amendment was voted down, 11 yeas to 65 nays. 82 Cong. Rec. 8123 (June 26, 1952). And the 1929 history is disconnected from the 1952 Congress, so the "probative value as to the motivations of the [later] Congress is limited." *Id.* (citing *City of Mobile, Ala. V. Bolden*, 446 U.S. 55, 74 (1980)). To meet his burden, Paredes-Medina needed to cite to legislative history showing racial animus in the enactment of § 1326 in 1952, but he has not done so. Instead, he urges me to consider the open racism in the enactment of the troubling, but not-passed, "Wetback Bill" and recounts this country's long, and often forgotten, history of racism against Latinos.

      I find persuasive the government's evidence that the legislative history of the 1952 Act demonstrates that it was not motivated by racial animus. ECF No. 33 at 14–20. The government cites a variety of evidentiary sources, including legislative history, suggesting that the primary focus of the debate surrounding the 1952 Act was the development of quotas for immigrants from various countries. *Id.* at 16–17. Its explanation comports with a historical investigation performed by the Ninth Circuit. *See United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977) (citing 98 Cong. Rec. 4301-21; 4399-16; 4422-44; 5088-115; 5149-81; 5209-40; 5326-34; 5408-43; 5756-804; 7016-19; 8253-68 (1952)) ("An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the Immigration and Nationality Act of June 27, 1952, but §§ 1325 and 1326 were not among the debated sections.").

Further, both professors whose testimony the *Carrillo-Lopez* court relied upon—and upon whose testimony Paredes-Medina now heavily relies in his motion—have stated that "the legislative history of the INA was largely free of explicitly racist expressions." *Machic-Xiap*, 2021 WL 3362738, at *13. The 1952 House Report contains only a brief description of §§ 1325 and 1326, stating, that "criminal sanctions are provided for . . . reentry of certain deported aliens." *Ortiz-Martinez*, 557 F.2d at 216 (quoting 1952 U.S. Code Cong. & Admin. News at 1724).

      I am not convinced that either silence as to the history of the 1929 enactment, or the lack of an outright repudiation of racist sentiments at the time of enactment in 1952, suffice for Paredes-Medina to meet his burden demonstrating racially discriminatory intent or purpose. The law applies to *any person* who unlawfully enters and remains in the United States, not only Latinos. In fact, as stated during a more recent reenactment of § 1326, there exist basic reasons that aliens have been excluded from this country, including those with criminal histories, who may be deemed public health risks, who violate drug laws, and who have previously violated immigration laws. 136 Cong. Rec. 36844 (Oct. 27, 1990), Statement of Congressman Fish. And while the parties agree that § 1326 disparately impacts Latinos, as discussed *supra*, that impact is logical given the world's geography and immigration patterns. S*ee Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (rejecting an argument that the disparate impact of an immigration policy on Latinos from Mexico showed discriminatory animus because otherwise "virtually any generally applicable immigration policy could be challenged on equal protection grounds"). That proximity emphasizes the causal impact of the socioeconomic issues in other neighboring countries on the United States. Thus, "[e]ven conscious awareness on the part of the decisionmaker that the policy will have a racially disparate impact does not invalidate an otherwise valid law, so long as that awareness played no causal role" in the adoption of the policy. *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 552 (3d Cir. 2011) (cleaned up).

Critically absent from Paredes-Medina's motion is a link between the legislative history of the 1929 Undesirable Aliens Act and the 1952 enactment of § 1326.[7] Instead, he broadly argues that the "1952 recodification [of § 1326] did not cleanse the unlawful reentry statute of its racist origins," that the 1952 statute is nearly identical to the 1929 version, and that the 1952 Congress was aware of the statute's racist underpinnings and the disparate impact that reentry criminalization had on Latinos. ECF No. 30 at 21. Consequently, Paredes-Medina has not met his burden, so his motion is denied.

**VII.   Conclusion**

IT IS HEREBY ORDERED that interested party American Civil Liberties Union of Nevada's motion for leave to file a brief as *amici curiae* [ECF No. 29] is GRANTED.

IT IS FURTHER ORDERED that Defendant Juan Pablo Paredes-Medina's motion to dismiss the indictment [ECF No. 30] is DENIED.

DATED this October 13, 2022.

_____
Cristina D. Silva
United States District Judge

---

[7] The ACLU, on behalf of Paredes-Medina, argues that Nevada Senator Pat McCarran was a "virulent racist" who sought to include § 1326 in the 1952 Act "to perpetuate a system of white supremacy which lives on today." ECF No. 29-1 at 10. While McCarran's statements were vile, an equal-protection challenge must tie the allegedly discriminatory intent to the specific legislation itself, not merely the words of the congresspersons supporting it. *See Ramos*, 975 F.3d at 897 ("Plaintiff's EPC claim fails predominantly due to the glaring lack of evidence tying the President's allegedly discriminatory intent to the specific TPS terminations."); *Arlington Heights*, 429 U.S. at 266–68 (stating that a factor to consider is the legislative history and "what it reveals about the purpose of the official action"). Without some causal link, evidence that McCarran harbored animus toward individuals who practice Judaism, as well as his use of slurs when speaking about individuals of Hispanic descent, fails to satisfy that standard.